John KISSINGER, Libelant,

v.

UNITED STATES of America, Respond-
ent-Petitioner (Agmarine Contracting
Co., Inc., Respondent-Impleaded,
and
International Elevating Company,
Respondent-Impleaded).

No. 20402.

United States District Court
E. D. New York.

Sept. 14, 1959.

Zimmerman & Zimmerman, New York City, by Bernard K. Zimmerman, New York City, for libelant.

Cornelius W. Wickersham, Jr., U. S. Atty. for Eastern District of New York, Brooklyn, N. Y., by Walter L. Hopkins, Admiralty and Shipping Section, Department of Justice, New York City, for the U. S.

Lawless & Lynch, New York City, by William F. Larkin, New York City, for Agmarine Contracting Co., Inc.

Galli & Locker, New York City, by Patrick J. McCann, New York City, for International Elevating Co.

RAYFIEL, District Judge.

The libelant, an employee of Agmarine Contracting Co., Inc., hereinafter called Agmarine, filed his libel for the recovery of damages from the respondent for injuries which he sustained on August 6, 1953, on board the S.S. Lord Delaware, owned by the respondent. His claim, bottomed on both unseaworthiness and negligence, is that while necessarily walking on and across certain hatchcovers on hatch No. 3 of said vessel for the purpose of returning other hatchcovers to their proper places, one of the boards composing a hatchcover on which he had occasion to step collapsed beneath him because of its rotted and cracked condition, causing him to be precipitated into the hold, as a result of which he sustained his injuries.

The respondent impleaded Agmarine and International Elevating Company, hereinafter called International, claiming the right to indemnification from either or both of them for any recovery had against it.

The Lord Delaware, for some time prior to August 6, 1953, had been part of a reserve fleet kept at Tompkins Cove, in the Hudson River, some 30 miles north of New York City. Specifications for her de-activation had been issued (Respondent's Exh. H), pursuant to which her generators and machinery had been disconnected, her rigging removed, her lifeboats stowed away, and a number of operational parts and various items of equipment transferred. A certificate indicating the completion of such work (Respondent's Exh. I) was issued on April 24, 1952.

The respondent entered into a contract with Agmarine (Libelant's Exh. 3) under the terms of which the latter agreed, among other things, to clean the Lord Delaware, install certain tubing and ventilating equipment, and otherwise render her suitable for the storage of grain. She was then to be loaded and returned to Tompkins Cove, where she was to serve as a floating warehouse for said grain.

At about 3:30 P.M. on July 28, 1953, the Lord Delaware left her anchorage at Tompkins Cove in tow of two tugs, and arrived at Weehawken, New Jersey, at about 8:15 P.M. on that day. On her trip she was in charge of her master, Ole Kjeldsen, an employee of the respondent, and had a riding crew of six men,

employees of Agmarine. A ship's log was kept (Libelant's Exh. 2), in which were recorded the customary entries, such as, among others, dates and places of arrival, soundings, temperature and other weather conditions, and times of arrival on and departure from the vessel of various persons.

On August 3rd the cleaning of the vessel, and its preparation for the receipt of the grain, had been completed, and loading commenced. The loading was performed by employees of International, which had been engaged by the respondent for that purpose. The loading of hatch No. 3 commenced at about 1:00 P.M. on August 5th, continued through that working day, and was completed at about 9:00 A.M. on August 6th. The loading was accomplished by passing the grain from its source of supply off the vessel through tubes placed into openings in said hatch created by the removal of some of its hatchcovers, and into the lower hold. Hatch No. 3 was approximately 20' x 20' in dimensions, and was provided with 36 hatchcovers, each approximately 5' 0⅜" in length and 2' 3⅛" in width. The hatchcovers were laid in four rows of nine each, running athwartships, the long side of each hatchcover, of course, running fore and aft. The hatchcovers in the foremost row, which we shall call the first row, were numbered consecutively from 1 to 9, and those in the second, third and fourth rows were numbered 10 to 18, 19 to 27 and 28 to 36 respectively, the lowest number in each row being at the port end of the row. Each of the hatchcovers was composed of three boards, running lengthwise, held together by a metal strap or band at both ends, and by one or three steel bars—there was some conflict in the testimony as to the number—running through said boards and at right angles thereto.

None of the hatchcovers in rows 2 and 3, numbered from 10 to 27, inclusive, had been removed for the grain-loading operation, the tubes having been inserted for that purpose in the openings created by the removal of the hatchcovers in rows 1 and 4. During the loading a small amount of the grain or grain dust leaked or was blown onto the deck in the vicinity of hatch No. 3, where the hatchcovers from rows 1 and 4 had been placed, and an even smaller amount fell upon some of the hatchcovers in rows 2 and 3.

When the loading had been completed the libelant and two other employees of Agmarine, Pepitone and Corbett, were instructed by the master, Ole Kjeldsen, to go into the hold and cover the grain with the 'tweendeck hatchcovers, in order to secure it against shifting, and then to return to the main deck and close hatch No. 3. All of this work was done at the direction, and some of it under the supervision of Kjeldsen, as was provided in the aforementioned agreement (Libelant's Exh. 3), the pertinent part of item No. 14 of which reads as follows:

"*Grain covering and battening of hatches (after loading)*

"(a) Upon completion of loading the contractor is to secure the grain cargo by spreading the 'tween deck hatchcovers on top of the grain. * * * These covers shall be laid in a fore and aft position, *under the direction of the Master*." (Emphasis added.)

"(b) Contractor to re-install hatch beams (if necessary), hatch boards, covers and three (3) tarpaulins, *under the direction of the Master* after the loading of cargo has been completed. * * *" (Emphasis added.)

As hereinabove stated, the hatchcovers composing rows 2 and 3 were intact, not having been removed in the loading operation, and the libelant, together with Pepitone and Corbett, proceeded to install the hatchcovers in the aftermost (Nos. 28 to 36, inclusive) and foremost (Nos. 1 to 9, inclusive) rows.

The hatchcovers in rows 1 and 4, which had been removed to permit the loading of the grain, had been placed, as aforesaid, on the deck alongside hatch No. 3, on both its port and starboard sides. The replacing of the hatchcovers was accomplished in this manner. Two of the

men would hold a hatchcover, one at each end, rest it on the coaming, and then set it between the hatchbeams and slide it into its proper place. Because of their limited reach they were able, from their position on the deck, to install only three hatchcovers, beginning at each end of the row, thus leaving the three center spaces open. They were unable to push the six hatchcovers thus installed farther toward the center because some of them were warped or their metal straps or bands broken, or because the hatch beams were bent in certain places. In order to install the remaining hatchcovers it was therefore necessary for two of Agmarine's men to work on top of the hatch. The third man would slide a hatchcover onto the coaming—it was too heavy to be lifted by one man—a second man would drag it to the opening into which it was to be installed, and the third would join him in sliding it and then setting it into its proper place. It was sometimes necessary for all three to co-operate in setting a hatchcover into place. It was in that fashion that the hatchcovers in the aftermost or fourth row were restored to their proper places.

The three then continued with the installation of the hatchcovers in the foremost row, following the same procedure they had used in the fourth row. Two or three hatchcovers were installed in their places at each end of the row, and then Pepitone and the libelant mounted the top of the hatch while Corbett remained on deck close to the hatch. They continued their operation until only two hatchcovers (Nos. 5 and 6) remained to be installed. Corbett placed a hatchcover on the coaming alongside of No. 27, at which point the libelant took it, placed it under his left arm, and dragged it in a diagonal direction forward and toward the center of the foremost row to a position about where Pepitone was standing. It was his intention to install it in space No. 6. As he stepped upon hatchcover No. 16, which lay in his course, it gave way beneath him, causing him to be precipitated into the hold, and to sustain his resultant injuries.

The respondent denies its liability to the libelant, contending

(1) that no warranty of seaworthiness of the Lord Delaware extended to the libelant,

(2) that it did not neglect any duty which it owed him,

(3) that the libelant was guilty of contributory negligence, and, further,

(4) that if it (the respondent) should be held liable to him it is entitled to indemnification from either or both of the respondents-impleaded. Those points will be considered in that order.

The respondent argues that the Lord Delaware had been de-activated, was no longer in commerce and navigation, and to all intents and purposes was a dead ship, to be used exclusively as a floating warehouse for the storage of grain. It claims, therefore, that no warranty of seaworthiness extends to the libelant. In support of its position it cites the case of Hawn v. American S.S. Co., 2 Cir., 107 F.2d 999. Hawn brought an action under the Jones Act, 46 U.S.C.A. § 688, to recover damages for injuries which he had sustained aboard defendant's vessel. The facts in the case, so far as they related to the use and condition of the ship, were quite similar to those in the case at bar. It likewise involved a vessel which had been removed from navigation, was without motive power, and, after having been loaded with a cargo of soy beans, was to serve as a floating warehouse. There, too, the plaintiff's duties consisted, *inter alia*, of removing the hatchcovers and attending to lines, as the vessel was shifted back and forth along the dock to facilitate the loading of the cargo. The District Judge, finding that the vessel had been withdrawn from navigation, and that the plaintiff was not a member of the crew since the vessel had no crew, granted defendant's motion for a directed verdict and dismissed the complaint. The Circuit Court of Appeals affirmed. Hawn v. American S.S. Co., supra.

In The Bound Brook, D.C., 146 F. 160, at page 164, the Court said, "When the

'crew' of a vessel is referred to, those persons are naturally and primarily meant who are on board her aiding in her navigation, without reference to the nature of the arrangement under which they are on board." In the case of Carumbo v. Cape Cod S.S. Co., 1 Cir., 123 F. 2d 991, at page 995, the Court said, "The requirements that the ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation appear to us to be the essential and decisive elements of the definition of a 'member of the crew'."

None of those tests or requirements is met in the instant case. It is true that the libelant assisted in handling the lines and berthing the vessel, but those duties are frequently performed by longshoremen and harbor workers. He did not aid in the navigation of the vessel, for it had been de-activated, and was no longer in or capable of navigation.

■ A recent case involving the question of seaworthiness is Owens v. United States of America, D.C., 1958 A.M.C. 216, not officially reported. The Court there said that the warranty of seaworthiness requires the concurrence of two essential conditions: a vessel in navigation and a seaman in being, and, further, that a de-activated vessel, even though undergoing reactivation, is not a vessel in navigation subject to the warranty of seaworthiness. Clearly, then, such a warranty did not extend to the libelant herein.

Senko v. La Crosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, Hercules Co., Inc. v. The Brigadier General Absolom Baird, 3 Cir., 214 F.2d 66 and Pleason v. Gulfport Shipbuilding Corp., 5 Cir., 221 F.2d 621, 1955 A.M.C. 794, cited by the libelant in support of his claim of unseaworthiness, are distinguishable from the case at bar, and Halecki v. United New York and New Jersey Sandy Hook Pilots Ass'n, 2 Cir., 251 F.2d 708, also cited, has since been reversed. 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541. I find, accordingly, that the libelant has failed to sustain his claim of unseaworthiness.

*As to the claim of negligence.*

■ The libelant, necessarily on board the Lord Delaware as an employee of Agmarine, was a business invitee, and, accordingly, the respondent owed him the duty of providing him with a safe place in which to perform his work. That duty was non-delegable. It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew. See Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 630, 79 S.Ct. 406, 3 L.Ed.2d 550. That case involved a *licensee* aboard the vessel. Certainly the respondent owed at least as great a duty to this libelant, who was a *business invitee.* Did the respondent properly and adequately discharge that duty? I think it did not.

The libelant, as required by the aforementioned agreement (Libelant's Exhibit No. 3), performed his work under the direction and supervision of the Master, the respondent's employee. He, Pepitone and Corbett were ordered by the Master to close hatch No. 3 after the completion of the loading. Compliance with that order required two of Agmarine's men to walk on top of and across some of the hatchcovers to replace others which had been removed in the grain-loading operation.

The witnesses were in general agreement that a number of the hatchcovers were defective. The libelant testified on direct examination (S.M. pp. 70, 71) that hatchcover No. 16, on which he was obliged to step in order to replace hatchcovers No. 5 and 6, gave way under him, and that "it was broke, and when I stepped on it, it just gave way—just fell down." On cross-examination he stated (S.M. pp. 134, 135) that the center board of hatchcover No. 16 was cracked. There were a few minor inconsistencies, it is true, between his testimony at the trial and statements in his deposition respecting the hatchcovers, but they were

understandable in view of the substantial lapse of time between those occurrences. He consistently maintained, however, that the board gave way under him, tilted, and caused him to fall into the hold.

Corbett, called as a witness by the Government, answering a question as to whether he saw any condition on the hatch which might have caused the libelant to fall, stated "There was bad hatches on there." On cross-examination he was asked (S.M. p. 331):

"Q. When you say these hatchcovers were broken, would you please tell us in what respects they were broken? A. They were split, like something heavy went in."

He stated further (S.M. p. 331) that there were broken hatchcovers among those across which the libelant was walking.

Pepitone testified that he stepped on board No. 16 after Kissinger had fallen into the hold. He was asked (S.M. p. 210) the following question:

"Will you tell the Court just exactly what you observed about it?"

He answered: "I went back up. I stepped on it and it went down about an inch, about an inch and a half, you know. When you put your weight on it it would go down and the back would come up."

Later in his testimony he was asked to describe one of the boards in hatchcover No. 16, which, he had stated, was broken. He testified as follows (S.M. pp. 216, 217):

"Q. This break in the board, would you please tell us the appearance of it? Can you tell us in general what the appearance of this break was? A. It was poor.

"Q. What was the appearance of it? A. It was bad.

"Q. Was there white wood there, or how did that look? A. Like, in other words, in plain English, it was rotten."

I am satisfied that the condition of the hatchcovers, as testified to by Kissinger, Pepitone and Corbett, created a hazard of which the Master must or should have had knowledge. He directed and supervised the loading operation at hatch No. 3. He testified that he inspected the hatchcovers daily, and that on the day of the accident to Kissinger, after ordering the men to close that hatch, he (the Master) went atop the hatchcovers and inspected them again. (S.M. p. 375.) He denied, it is true, that any of the hatchcovers were broken, but the weight of the credible evidence did not support his statement. I was not favorably impressed with him as a witness. I found him to be frequently evasive, equivocal and excessively cautious.

The respondent's claim that the libelants' fall was occasioned by his slipping on grain which had accumulated on the hatchcover is not supported by the record. There was no evidence that there was any substantial amount of grain on any of the hatchcovers in the second and third rows, and no testimony that there was any grain at all on hatchcover No. 16, on which the libelant was standing immediately before he fell into the hold. Kissinger maintained steadfastly that it was a defective board, and not grain, which was responsible for his fall. Corbett testified that there was merely a sprinkling of grain in the area of the hatchcovers on top of the hatch, but did not specifically locate it. While some grain had accumulated on and in the vicinity of the hatchcovers which had been removed and placed on the deck to permit the loading of the grain into the hold of hatch No. 3, the evidence was that each of those hatchcovers was freed of grain by tilting it and striking it on the deck or coaming.

As a matter of fact the Master himself testified (S.M. p. 409) that he saw nothing on the hatchcovers which required cleaning. While he did not specifically mention grain it would seem that he referred to grain since there was no testimony respecting the presence of anything else which might require cleaning. Pepitone testified (S.M. p. 217) that there were only a few scattered pieces of grain

or grain dust on the hatchcovers in the second and third rows. He was not asked to and did not locate the particular boards which contained such grain or grain dust.

■ It is true that, respecting the presence of grain on the hatch, the testimony of Pepitone and Corbett was inconsistent with written statements which each of them had signed in 1953 (Respondent's Exhibits E and G, respectively). I have given consideration to those statements, not as proof of the truth of the contents thereof, but in evaluating the credibility of their testimony. 3 Wigmore on Evidence § 1018, 3d Ed. Despite such inconsistency I was favorably impressed with their testimony at the trial. The statements (Exhibits E and G) are not persuasive. They are brief, lacking in detail, and couched in virtually identical language, which is obviously not that of the signers. I am satisfied, therefore, and I accordingly find, that the respondent was negligent in having failed to exercise reasonable care in providing the libelant, a business invitee, with a safe place in and on which to perform his work, in that a board in the hatchcover on which he had occasion to stand in the performance of his work was decayed and defective, as a result of which he was caused to fall into the hold and sustain serious injuries.

There was no proof whatsoever to support the respondent's claim that the libelant was contributorily negligent.

■ The respondent contends that if libelant sustained his injuries because of a defective hatch board it is entitled to indemnification from Agmarine and International because of their failure to report the condition, since the hatch was turned over to their exclusive possession and control, and if his injuries resulted from the presence of grain on the hatchcovers it is entitled to indemnification from them because of the breach on their part of an implied warranty to perform their work in a proper and workmanlike manner. The respondent's contentions are without merit. Ryan Stevedoring

Co., Inc. v. Pan-American Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, cited in support of its contentions are not analogous. The loading of the grain, the replacement of the hatchcovers, and the other work performed by Agmarine's men, including the libelant, were all done under the direction and supervision of the Master of the vessel, and there was no proof that it was done carelessly or improperly.

*As to the damage sustained by the libelant.*

■ As a result of his fall the libelant sustained fractures of the left transverse processes of four lumbar vertebrae. He was confined to a hospital for about two weeks, during which he was frequently in considerable pain, requiring morphine, codeine and other sedatives.

Between August 30, 1953 and February 17, 1955, he was under regular treatment by a Dr. Goldberg. His condition showed steady improvement. At the end of such treatment there was considerable function (S.M. p. 262). Except for about three days of light work which he performed for Agmarine in or about March, 1955, he was unable to return to gainful work until June, 1955, when he obtained employment as a maintenance man for a concern which operated a chain of retail stores. His work required him to drive a truck from store to store, his duties there consisting of waxing floors, washing windows and similar work.

Dr. Goldberg testified that the libelant sustained a permanent partial disability of his back as a result of his accident (S.M. pp. 276–278), and that if he were to attempt to lift heavy weights and perform the arduous work of a longshoreman he might experience further exacerbations. No testimony was adduced by the respondent to contradict Dr. Goldberg. The work the libelant now performs as a maintenance man appears to be less onerous than his former work. It is my opinion that while the libelant has made a fairly substantial recovery he

still suffers, and will probably continue indefinitely to suffer some disability of the lumbar area.

In 1951 the libelant's earnings with Agmarine aggregated $2,912.76, and in 1952 he earned $2,887.62. His hourly rate of pay then was $1.90. Manifestly, then, he worked considerably less than 40 hours per week in 1951 and 1952. Between January 1, 1953 and August 6, 1953, the date of the accident, he earned $2,306, which would indicate, at $1.90 per hour, that he had worked about 40 hours per week in 1953. If he had been able to work for the remainder of 1953 his earnings for that year would have approximated $3,840. Using that figure as a basis, his damage for loss of earnings for the period between August, 1953 and June, 1955, when he returned to work, would be $7,720.

When libelant entered upon his present employment his compensation was at the rate of $1.23 per hour. At the time of the trial that had been increased to $1.53. Between June, 1955 and the end of that calendar year he earned $2,123. In 1956, the last year for which we have a specific figure, he earned $4,149.52.

Obviously, in the light of the difference in hourly pay between his former and present employment, the libelant is now obliged to work a greater number of hours to earn a given income, which, in 1956, was greater than he had previously earned with Agmarine. In 1951 and 1952 he was apparently unable to obtain 40 hours of work a week with Agmarine. In his present job he is able to obtain both regular and overtime employment. Certainly the respondent's financial responsibility herein should not be reduced because of such fortuitous circumstances, or because the libelant, by reason of his application to his work, is able to earn a greater income than he had earned before the accident. The fact is that his earning capacity has been impaired to the extent, I believe, that I have hereinabove indicated. There is no formula by which we can admeasure or apportion his loss of future earnings with accuracy, largely because of uncertainty as to whether he would have been able to obtain full 40 hour employment as a longshoreman or that he would have continuous overtime in his present job.

The libelant was 36 years of age at the time of the trial. I estimated his working expectancy to continue to 65 years of age, a period of 29 years. On the basis of a 40 hour work week, and the difference in the hourly wage rates of 1.53 and 2.10, the libelant's loss of future earnings would be $1,140 per annum. That figure fails to take into account, however, the fact that with Agmarine he was generally unable to obtain 40 hours of work per week, as well as the fact his physical condition is such that he is able to perform substantial overtime employment. I believe $500 per annum would be a fair estimate of such loss. Projected over a period of 29 years that would amount to $14,500, the present value of which, according to the 3½ per cent table, is $9,018.

The parties stipulated that the libelant's medical expenses aggregated $1,652.

I find that the libelant's loss of earnings for the period between the date of his accident and his return to work in June, 1955 is $7,720, and for the period between June 1, 1955 and the end of the calendar year 1958, at the rate of $500 per annum, $1,790.

I find, also, that the libelant is entitled to recover the sum of $5,000 for pain and suffering.

Accordingly, judgment is rendered in behalf of the libelant and against the respondent in the sum of $25,180.

The respondent's claims-over against Agmarine and International are dismissed.

Submit proposed findings of fact, conclusions of law and decree in conformity herewith.