282 F.2d 413
 William J. ROPER, Libellant, Appellant,
v.
UNITED STATES of America, Respondent-Petitioner; Continental
Grain Company, Respondent-Impleaded, Petitioner; and John W.
McGrath Corporation and Arrow Steamship Agency, Inc., t/a
Atlantic and Gulf Grain Stevedoring Association,
respondent-Impleaded, Appellees.
 No. 7986.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 7, 1960.
Decided Aug. 30, 1960.
 
 Sidney H. Kelsey, Norfolk, Va., for appellant.
 Carl C. Davis and Alan Raywid, Attorneys, Department of Justice, Washington, D.C. (George Cochran Doub, Asst. Atty. Gen., Joseph S. Bambacus, U.S. Atty., Richmond, Va., and Samuel D. Slade, Attorney, Department of Justice, Washington, D.C., on brief), for appellee, United States of America.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 The foreman of a gand of stevedores was injured when there was a rupture of a block on machinery attached to a grain elevator, but partially lowered into the hold of a deactivated vessel owned by the United States. Under the Suits in Admiralty Act[1] he filed a libel against the United States. This action resulted in the usual petition to implead the granary, with which the United States had contracted for the unloading of the vessel, and a further petition by the granary to implead the stevedore, the employer of the injured man, with which it had contracted for the incidental stevedoring work. The District Court dismissed the libel after finding that the United States was not negligent and had not warranted that the machinery of the granary was 'seaworthy.'
 
 
 2
 The principal question is whether the owner of a deactivated vessel warrants to a stevedore employed by a granary the condition of the granary's unloading machinery. We agree with the District Court that it does not.
 
 
 3
 The Harry Lane, a Liberty ship owned by the United States, was deactivated in 1945. Her supplies, stores, and nautical instruments were removed. Her boilers, engines and pipes were drained, flushed with preservatives or filled with grease. The tail shaft and propeller were locked and the rudder fixed amindship. Her cargo gear and tackle were stripped, her winches drained and the packing removed from the pistons. Her Coast Guard Certificate of Inspection was lifted and the biannual Coast Guard inspection suspended. She was then relegated to the James River Reserve Fleet, a 'moth ball fleet.' She could not be operated again as a commercial vessel without a major overhaul and relicensing and recertification.
 
 
 4
 There she remained until the price support program for wheat resulted in such surpluses that the storage facilities for grains were taxed. She, with a number of other 'moth-balled' vessels, was then pressed into service as a floating warehouse. She was modified to provide additional ventilation to her holds to protect the grain which was expected to be stored there for a long period.
 
 
 5
 In June 1954, the Harry Lane was towed to the Norfolk & Western grain elevator at Norfolk, loaded with surplus grain and returned to the Reserve Fleet. She remained there until September 1956, when she was again towed to the Norfolk & Western grain elevator for the purpose of discharging the grain she had taken on more than two years earlier.
 
 
 6
 This use of the vessel was under a general storage agreement between Continental Grain Company, the lessee of the Norfolk & Western grain elevator, and Commodity Credit Corporation supplemented by specific agreements for the utilization of the storage space in deactivated vessels of the Reserve Fleet. Continental, in turn, had a contract with Atlantic and Gulf Grain Stevedoring Associates pursuant to which Atlantic and Gulf supplied the necessary stevedoring services.
 
 
 7
 Norfolk & Western's elevator was equipped with a 'Marine leg,' a device for unloading grains. It is a large piece of equipment, permanently affixed to the elevator and to the dock. It is incapable of lateral movement, but, when a ship is properly placed beneath it, the mouth of the leg may be lowered into the hold until it is in contact with the grain. The marine leg is, basically, a housing containing a system of endless-belt, graincarrying conveyors. These conveyers elevate the grain through the leg and carry it horizontally into the elevator.
 
 
 8
 When the grain has been removed to the point that the mouth of the leg is on the bottom of the hold and the elevation of the grain in the corners and remote areas of the hold has been so reduced that the grain no longer flows to the leg, it is necessary to bring such remaining grain to the leg and its elevating machinery. For this purpose, the leg is equipped with four plows or grain shovels. Each of these plows is connected, through a bridle, to a line which runs through a block attached to a pad eye at one of the corners of the leg, near the mouth, and thence, through other blocks to one of several small drum winches, high in the leg but controlled by the longshoremen in the hold by means of a clutch line.
 
 
 9
 The procedure is for a longshoreman to walk the plow away from the leg and place it in any desired location. When the plow has been placed, the drum winch is engaged through the clutch line. As the drum takes up the plowline, it draws the plow, and the grain in front of it, back to the leg.
 
 
 10
 On the day of his injury, Roper was supervisimg a crew of stevedores operating the grain plows. He undertook to demonstrate to one of them a more efficient use of the plow. During the course of this demonstration, after the drum winch had been engaged and while the plowline was in tension, a strap holding the plowline block near the mouth of the leg broke, and the block flew into Roper's face.
 
 
 11
 Subsequent examination of the block disclosed the fact that its bushing had become worn, allowing the sheave to wobble and to contact the strap. The turnings of the sheave cut into the strap until the strap failed.
 
 
 12
 The block was unsafe for use, but the defect was not apparent upon a visual inspection of the assembled block. Indeed, Roper testified that one of his duties was to inspect the marine leg and its equipment prior to each use of it and that he had inspected it on the day that he was injured. The defect would have been apparent if the block had been disassembled. The disassembly of one block would not have been a complicated operation nor of long duration. If there was a duty to disassemble this block for inspection purposes, however, the duty would require the disassembly and minute inspection of all of the blocks, tackle and equipment used in association with the marine leg, perhaps the conveying machinery of the leg itself.
 
 
 13
 Under these circumstances, we think there is ample support for the finding that there was no showing of negligence on the part of the United States. It had engaged the expert operator of the machinery to do the work and it, in turn, had engaged the expert stevedores, who regularly worked with the machine, to perform the stevedoring service. The duty of care by the owner of a live ship to make her safe for the work to be done would hardly require it to make such a minute inspection of shore-based machinery not in its control as would have been required to disclose the defect here. When the United States engaged competent people to do the work in which they were specialists, it was not required to verify for itself the effectiveness of the expert's maintenance of his specialized equipment.
 
 
 14
 The more important question is whether the United States, as owner of this deactivated vessel, warranted to the stevedore the soundness of the marine leg and its appliances. The District Court did not consider whether the usual warranty of seaworthiness would encompass this sort of shore-based, shore-attached equipment,[2] for it held there was no warranty of seaworthiness. Since we agree, we also confine ourselves to the holding that there was here no warranty of the seaworthiness of any unloading equipment.
 
 
 15
 It is now settled that a deactivated vessel in one of the 'moth ball' fleets is, for these purposes, dead and withdrawn from navigation, so that there is no warranty of her seaworthiness.[3] Generally, the warranty of seaworthiness would not arise again until the vessel had been put through a major overhaul and she and her appliances and rigging had been reconditioned, restored and recertified.
 
 
 16
 In West, as here, the vessel was a deactivated Liberty ship which had been in the moth ball fleet at Norfolk. She was towed from Norfolk to Philadelphia and there delivered to a ship yard for the purpose of being reconditioned and reactivated. She had aboard several men who became her principal officers when she was recommissioned, but, though in the general employ of the owner, they had not signed on the vessel when, during the course of the reconditioning work, West was injured. These men had the right to inspect the work on behalf of the United States, but no right to control or supervise it. So here, the riding master had no authority to control or supervise the unloading operation, for his duties were limited to protection of the vessel from such hazards as fire and pilferage.[4]
 
 
 17
 In deciding that there was no warranty of seaworthiness, the Supreme Court in West assumed that the injured man may have been doing seamen's work. It held there was no warranty to anyone, whatever the nature of the particular work he was doing, because the vessel affirmatively represented that she was not sound or fit for sea and the work was controlled by the shipyard. Here the ship affirmatively represented that her unloading equipment was not sound or fit for use and the work being done was controlled by the elevator, not by the ship or her owner.
 
 
 18
 Roper seeks to avoid the thrust of West by contending that the Harry Lane was returned to navigation when she was placed in service as a floating warehouse and moved from the Reserve Fleet to the grain elevator. He argues that she was actually 'carrying' cargo, that the movement was in furtherance of a commercial transaction and that she should be treated as if she had been reactivated and returned to service.
 
 
 19
 Of course, the United States was under a duty to exercise care to see that such things as the vessel's hatch covers and ladders, with which the stevedores must necessarily work, were reasonably safe for use. Should we ignore the fact that the vessel had no crew and carry Roper's contentions to their extremities, we could, at most, find a warranty that the ship, itself, her hatch covers and ladders were safe for their intended use.[5] No such limited use could give rise to a warranty of seaworthiness of unloading equipment, all of which was still in 'moth balls' or completely removed.
 
 
 20
 Petterson v. Alaska Steamship Co.[6] and Rogers v. Inited States Lines[7] extended a live ship's warranty of her unloading equipment and gear to similar appliances brought aboard by the stevedore and used with the actual or implied permission of the ship. In such situations it is appropriate that the protection of the warranty not depend upon technicalities of title. Those cases in no way suggest, however, that a dead vessel which does not warrant its own equipment, and no one supposed it did, nevertheless warrants the machinery of a granary simply because it is used to unload the vessel. It is not the fact that an unloading operation is being performed which gives rise to the warranty, but the fact that the vessel in service ordinarily represents she is sound and complete in her gear and equipment. There was no such representation here, for the vessel clearly represented itself as being entirely without operable equipment and usable gear. The ship which has no equipment or gear to warrant, does not warrant to others the soundness of machinery they bring aboard.
 
 
 21
 We conclude that the owner of this dead vessel did not warrant to Roper the soundness of the granary's machinery.
 
 
 22
 Affirmed.
 
 
 23
 SOBELOFF, Chief Judge (dissenting).
 
 
 24
 The incontestable fact in this action by the longshoreman Roper against the S/S 'Harry Lane' is that recovery is denied for injuries resulting from a defect in equipment actively in use in discharging cargo.
 
 
 25
 It is insisted, first, that there was no negligence in failing to inspect the gear. It is said that the burden of such inspection would be excessive and is therefore not required. There is no need to analyze this reasoning, for the point is immaterial, if the warranty of seaworthiness extends to this situation.
 
 
 26
 On the second branch of the case, based on the claimed warranty of seaworthiness, the majority concludes, in accordance with the shipowner's contention, that this was a 'dead ship,' which owed the plaintiff no such obligation.
 
 
 27
 This was no dead ship. The stereotype does not fit and will not survive analysis. A phrase, apt enough to describe an inert vessel undergoing major repairs in a shipyard, is completely misapplied to one in course of discharging cargo-- cargo which she has just transported many miles for delivery precisely as any other cargo carrier might do.[1]
 
 
 28
 It does not matter that before making the journey the vessel was inactive, or that she might thereafter again resume inactivity. We find her fully active on the day with which we are concerned. Unlike a repair-worker called in to make a vessel fit for service, as in West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, this plaintiff came aboard to perform a task rightly called traditional for seamen. Due to a failure of the equipment, he met with injury while thus engaged. Does this not meet the law's every requirement for a recovery on the ground of the vessel's unseaworthiness? I think it does, recovery should not be denied because of the ship's status before the voyage in question or its expected later status. There is nothing logically inconsistent or legally incongruous in saying that the actual conditions at the time of the accident control, not the past or future.
 
 
 29
 The only similarity between the West case and this is that in each the ship had been for a time in the moth ball fleet. After this common point is established all resemblance between the two cases disappears. In West the vessel was delivered to a shipyard for major repairs and complete overhaul, without reservation of control or supervision over the work. In West there was no cargo aboard nor was any contemplated. She was in every real sense withdrawn completely from service. Here, however, the ship was taken from the moth ball fleet and put into service as a carrier to deliver grain to an elevator at a considerable distance. This is the outstanding feature of our case and gives the 'Harry Lane' its distinctive status as a carrier of cargo. Roper sustained injuries while assisting in the actual discharge of that cargo. As this is a seaman's traditional work, he is entitled to the benefit of the warranty of seaworthiness. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. United States, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.[2]
 
 
 30
 When the vessel in the West case was withdrawn from the moth ball fleet, if instead of being turned over to a contractor for 'complete overhaul,' it had been used to carry cargo to a distant point and the plaintiff met with injury while assisting in the unloading, I have no doubt the Supreme Court would have permitted recovery.[3]
 
 
 31
 Totally irrelevant is the meticulous description of the earlier removal of engines, etc. Reducing a fully equipped ocean-going vessel to the condition of a barge does not alter the case here, since on the occasion under inquiry the vessel had been towed, like a barge, with a load of grain and was in process of delivery when the gear failed. Barges are not exempt from the obligation of seaworthiness. A vessel is defined in 1 U.S.C.A. 3 as Follows:
 
 
 32
 'The word 'vessel' includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.'
 
 
 33
 See also Ex parte Easton, 1877, 95 U.S. 68, 24 L.Ed. 373 (a barge is a vessel such that there can arise a maritime lien for wharfage, enforceable by a District Court sitting in admiralty); Ellis v. United States, 1907, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047 (holding that scows and floating dredges are vessels, and that the men working on them are seamen); Goett v. Union Carbide Corp., 1960, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (a barge is a vessel to which the warranty of seaworthiness may be applicable); Jeffrey v. Henderson Bros., 4 Cir., 1951, 193 F.2d 589; Summerlin v. Massman Const. Co., 4 Cir., 1952, 199 F.2d 715.
 
 
 34
 Calling a cargo-carrying vessel a 'floating warehouse' does not distinguish it from other water carriers or alter its obligations under maritime law for defects resulting in injury to those handling its cargo. So, in a sense, may any cargo-bearing vessel be called a 'floating warehouse' while en route. Whatever the 'Harry Lane's' status may have been while idle and with a cargo aboard, her status as a vessel in navigation became clear when she proceeded to deliver the grain to the elevator more than twenty miles away. She was then not significantly different from any vessel that had never been in the moth ball fleet.
 
 
 35
 It is suggested that the vessel had no crew, but this vessel had a crew of six under a riding master while en route. The question of 'signing on' is of no importance under these circumstances. The statutes relating to signing on, even if applicable, are for the benefit and protection of the seamen and have never been deemed to limit the scope of the term 'seamen.'
 
 
 36
 Moreover, even if the seamen aboard the vessel during its journey would, for some reason, not be considered a crew, this would be immaterial. The absence of a regular crew may be significant in the case of a ship undergoing repair, as in West, for it then may be a factor in determining whether the ship has been withdrawn from navigation. However, our ship was unquestionably in navigation, being actually used as a barge, and transporting a cargo. As previously pointed out, barges, with no men aboard during the journey, but with motive power furnished by a tug, are vessels in navigation whose seaworthiness is warranted. The men aboard the tug constitute the crew responsible for the barge.
 
 
 37
 If, upon completion of the voyage, the crew, whether travelling aboard the vessel itself or on the tug which has it in tow, withdraws and the longshoremen take over to make effective the purpose of the voyage by unloading the goods, these men stand in the shoes of the seamen and are accorded the rights pertaining to seamen. Starting with International Stevedoring v. Haverty, 1926, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, through Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, to Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, this principle has been recognized and maintained both in the interpretation of the general maritime law and in the construction of statutes enacted for the benefit of seamen generally. The point is no longer debatable.
 
 
 38
 From the erroneous assumption that the vessel was a 'dead ship' owing no warranty of seaworthiness, the United States as owner proceeds to the next erroneous assertion-- a pure non sequitur-- that the vessel in any event warranted nothing beyond her own equipment. This contention, however, was put to rest by the Supreme Court in Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, where stevedore's tackle brought aboard was held appurtenant to the ship when used in the ship's service.
 
 
 39
 The Government also asserts that the marine leg, an endless belt extending into the bowel of the ship and lifting grain, is not to be considered a part of the ship's equipment, because it was land-based. The fallacy of this proposition is exposed by the holding in Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, where the shipowner was held liable for the unseaworthiness of the stevedore's land fall runner used to augment the ship's gear. Also, in The Tungus v. Skovgaard, 1959, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524, the defective equipment was shore-attached. There, a cargo of oil was being discharged from the vessel, and the company engaged for this purpose used its own pump and hoses to bring the oil ashore. This land-based equipment becoming defective, causing oil to spill on the deck, the plaintiff went aboard to make repairs. He slipped on the oil and fell to his death. The Supreme Court upheld the lower court's holding that he was protected by the warranty of seaworthiness. See also Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, where the detailed facts as to the injury itself are not revealed, but where apparently a similar situation was present.
 
 
 40
 It seems to me immaterial that the marine leg was attached at the top to the grain elevator on the pier. Its lower end extended into the ship's hold and was actually gathering the grain for discharge. The dominant fact is that it was equipment presently used in unloading. While ti seems to me unnecessary to establish which part of the marine leg failed, it may be noted in passing that the part that broke and caused the injury was a strap holding a block attached to a scoop then collecting grain from the bottom of the hold and making it available to the conveyor belt.
 
 
 41
 Furthermore, since the vessel had no equipment of her own there is even less reason than ordinarily to relieve her of the established obligation to arrange for seaworthy equipment to handle cargo. If a vessel which has a full complement of gear of her own is not excused for failure of equipment brought aboard by the stevedore, as in Petterson, a fortiori she is no less vulnerable when by failure to provide equipment of her own she must rely on that supplied by others. The fact that the United States employed the grain company, which in turn employed the stevedore to perform the unloading, is immaterial. The obligation of the United States was non-delegable, Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872; Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445; and it was absolute, Mitchell v. Trawler Racer Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941.
 
 
 42
 To summarize, Roper was aboard an active, not a dead vessel. To complete her journey it was necessary to unload the cargo of grain. While engaged in this traditional seamen's work Roper sustained injury due to faulty equipment assigned to his use. Under these circumstances, the Supreme Court has made it clear that one in the position of this plaintiff is entitled to indemnity from the vessel's owner. Therefore, I would reverse.
 
 
 
 [1]
 46 U.S.C.A. 741 et seq
 
 
 [2]
 See United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541. McKnight v. N. M. Paterson & Sons, Limited, D.C.N.D.Ohio, 181 F.Supp. 434
 
 
 [3]
 West v. United States 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161; see also Latus v. United States, 2 Cir., 277 F.2d 264, 265 (decided April 11, 1960); Kissinger v. United States, D.C.E.D.N.Y., 176 F.Supp. 828
 
 
 [4]
 To accomplish the movement of the vessel from the Reserve Fleet to the elevator, the custodial agent sent aboard a riding master and six seamen, but the seamen did not sign on the vessel. They took with them six mooring lines, a heaving line, fire hose, a boarding ladder, safety lamps, a sounding rod, a lead line and several electric light clusters. The seamen handled the mooring lines at the Reserve Fleet anchorage and at the elevator, but were then dismissed. The riding master remained employed to see that the ship was properly moored and kept clean, that the seals on her storerooms were not broken and that fire hazards were not created. He was not berthed or messed aboard. Indeed, he was not in command of the actual movement of the vessel, that having been under the control of the pilot captain of one of the two tug boats that moved the vessel
 
 
 [5]
 See, however, Hawn v. American S.S. Co., 2 Cir., 107 F.2d 999; Kissinger v. United States, D.C.E.D.N.Y., 176 F.Supp. 828
 
 
 [6]
 9 Cir., 205 F.2d 478, affirmed sub nom. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798
 
 
 [7]
 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120
 
 
 [1]
 In the record the journey is described variously as 'upstream' and 'downstream,' but it was stated at the oral argument that the vessel traversed a disstance of more than twenty miles from the 'moth ball' fleet to the grain elevator
 
 
 [2]
 With all deference to the opinion in Hawn v. American S/S Co., 2 Cir., 1939, 107 F.2d 499, it provides no authoritative guide. It was decided before Sieracki and the series of cases developing its doctrine
 
 
 [3]
 Lawlor v. Socony-Vacuum Oil Company, 2 Cir., 1960, 275 F.2d 599, points out the limits of the West doctrine. It holds that a ship in the yard for annual overhaul merely, as distinguished from major repairs, warrants to those working upon it that it is seaworthy. The instant case involves not even annual overhaul or any work which may be said to take it out of navigation