**William J. ROPER, Libellant,**

v.

**UNITED STATES of America, Respondent.**

**UNITED STATES of America, Petitioner,**

v.

**CONTINENTAL GRAIN COMPANY, Respondent-Impleaded.**

**CONTINENTAL GRAIN COMPANY, Petitioner,**

v.

**JOHN W. McGRATH CORPORATION and Arrow Steamship Agency, Incorporated, trading as Atlantic and Gulf Grain Stevedoring Associates, Respondent-Impleaded.**

No. 7818.

United States District Court
E. D. Virginia,
Norfolk Division.
Feb. 26, 1959.

Sidney H. Kelsey, Norfolk, Va., for libellant.

L. S. Parsons, Jr., U. S. Atty., John M. Hollis, Asst. U. S. Atty., Norfolk, Va., Alan Raywid, Dept. of Justice, Washington, D. C., for United States.

Jack E. Greer, Norfolk, Va., for Continental Grain Co.

Wm. B. Eley, Norfolk, Va., for Atlantic & Gulf Grain Stevedoring Associates.

WALTER E. HOFFMAN, District Judge.

The crucial question in this case is whether the warranty of seaworthiness, extended to a longshoreman working aboard a vessel while loading or unloading cargo under the doctrine enunciated in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, is applicable where the vessel being unloaded is dead and deactivated, but is being used by the Government for surplus grain storage. The Government contracts with a General Agent for certain services with respect to dead and deactivated vessels and, if the ship is merely used as a part of the grain storage program, the General Agent merely receives custody of the vessel, appoints a riding master, places linemen aboard, arranges for stevedoring services to attend the vessel on arrival at the grain elevator for the purpose of cleaning and preparing for the receipt of grain, provides the cleaning gang, supplies watchmen, mooring lines, fire extinguishers and fire hoses. The General Agent does not assume the responsibility of arranging for stevedoring services to load or unload the grain. Vessels are also assigned to a General Agent for the purpose of deactivation or where it is necessary to send the ships to a yard for repairs. The Maritime Commission requires documented seamen to handle the lines.

Libellant, a longshoreman employed by Atlantic and Gulf Grain Stevedoring Associates, was injured on October 2, 1956, while engaged in discharging grain from a hatch of the S.S. Harry Lane, a vessel owned by the United States. Continental Grain Company had contracted with the Government to unload the vessel and, in turn, had employed Atlantic and Gulf for necessary stevedoring services. The equipment in use at the time in question was owned and maintained by Continental. Attached to the loading pier of the grain elevator leased and maintained by Continental is a marine leg, the mouth of which is lowered into the hold of the vessel by a Continental employee in the control house of the equipment as directed by the stevedores. The motors of the leg run an endless conveyor belt.

with buckets which scoop up the grain, carrying it to the elevators. After the grain is unloaded to a certain depth, it is necessary to use grain shovels to remove the balance of the grain in the hold and cause it to be placed in the mouth of the leg. The shovels are rigged off each of the four corners of the mouth of the leg and consist of large flat wooden boards, with handles like a plow, and to the front of the shovel is attached a rope which runs to and through a block attached to a padeye at the corner near the mouth of the leg. The rope or line runs up the side of the leg through other blocks to a drum at the top of the leg. The line slacks off when the longshoreman operator walks the plow to the corner of the hold, but, when he is ready to plow the grain to the leg, another longshoreman standing by the leg pulls the clutch rope. The clutch so engaged permits the drum to wind the plow rope and pulls the plow to the mouth of the leg. As the grain is gradually removed from the hold, the block on each corner is moved to the lower padeye (there being two padeyes on each corner), the lower padeye being 12″ to 18″ from the bottom of the leg, and the other being from 18″ to 24″ above the lower padeye. A 10″ block on the corner of the leg broke due to defective bushings causing too great a play in the wheel; the strap was cut and the block struck libellant who was, at the time, instructing a longshoreman as to the procedure to follow in using the plow or scoop.

The evidence is insufficient to convict libellant of any contributory negligence. The defect in the block admittedly could not be ascertained from a visual inspection. As the equipment was owned and maintained by Continental, it manifestly was not incumbent upon the United States, Atlantic and Gulf, or the longshoremen, to take each block apart in order to ascertain whether it had been subjected to unusual wear. The responsibility for such inspection, if any, rested upon Continental, who occasionally used the marine leg and its blocks for the purpose of unloading barges and bay boats without the assistance of the expert stevedore. For reasons stated herein, we do not reach the determination of Continental's liability as a respondent impleaded. The Court finds, however, that the United States, Atlantic and Gulf, and the libellant were guilty of no negligence contributing to the accident.

The S.S. Harry Lane became a member of the James River Reserve Fleet, commonly referred to as the "moth ball fleet", in December, 1945. She was immediately deactivated which included, among others, the removal of perishables, inflammables, and nautical instruments. Her pipes and machinery were drained and her rudder, tail shaft, and propeller were firmly secured to prevent turning. Admittedly it would have required a major overhaul to reactivate the vessel, but the evidence discloses that some few vessels have been restored to service. There are approximately 360 vessels in the James River Fleet and none are certificated or licensed to operate as a vessel in navigation.

With the surplus of grain in this country, storage facilities were at a premium. The Commodity Credit Corporation entered into a contract with Continental to provide for the handling and servicing of this grain. In June 1954, the S.S. Harry Lane was loaded with grain, the grain was removed at the time of libellant's accident in 1956, and the vessel was thereafter returned to the "dead fleet".

The evidence discloses that the S.S. Harry Lane was placed under assignment to a General Agent on September 14, 1956, and withdrawn from the dead fleet for the purpose of discharging its cargo of 227,000 bushels of grain. When the grain is discharged from the vessel, it is graded and a warehouse receipt is issued to Commodity Credit Corporation.[1] It is then co-mingled with other grain of like class or grade. When the grain is loaded out of the elevator for

---

1. The details of the grain program as administered by the Department of Agriculture may be found in 6 C.F.R. 483.

the account of Commodity Credit, the receipts are cancelled in order of age. Daily records are maintained by the elevator showing the stock or inventory of grain, by quality, held for the benefit of the Government. On occasions Continental purchases grain on hand from Commodity Credit, but generally Continental acts only as warehouseman holding the grain for eventual purposes of sale by Commodity Credit. Infrequently, the grain is sometimes taken from one of the vessels of the dead fleet for turning, screening, blowing and aerating and, after such conditioning process, is reloaded on the vessel. As to the S.S. Harry Lane on the occasion in question, it is clear that the grain was taken to the elevator for the purpose of sale. It was, in that sense, a commercial venture.

Relying upon Petterson v. Alaska Steamship Co., 9 Cir., 205 F.2d 478, affirmed sub nom. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; and Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, libellant suggests that the shipowner is liable for unseaworthiness even though the breaking block was brought aboard the vessel by Continental as a part of its equipment and used by the stevedore. The United States insists that, under Petterson, the warranty of seaworthiness applies only to equipment commonly found as a part of the gear of the vessel and the stevedore, and not to a marine leg attached to the pier which is suspended over and partially lowered into the hold of the vessel. The more recent case of Berryhill v. Pacific Far East Line, Inc., 9 Cir., 238 F.2d 385, certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537, involved a claim for damages caused by a defective grinding wheel brought aboard the vessel by a machinist working for the shipyard. The Ninth Circuit, having previously ruled in favor of the injured party in Petterson, endeavored to distinguish the authorities and held that, since the repairs had nothing to do with loading or unloading the ship, the warranty of seaworthiness should not be extended beyond Petterson, Sieracki, and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. In the instant case, libellant was unquestionably injured during unloading operations by the defective condition of equipment not found aboard ship during navigation, but frequently used in the process of loading or unloading grain vessels. Cf. Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450, 454. While it is doubtful that the seaworthiness doctrine should be extended to include the marine leg, we find it unnecessary to determine this question and will assume, for the purpose of further discussion, that the shipowner warranted the seaworthiness of the marine leg if the vessel could be construed as being in navigation.

When the S.S. Harry Lane was removed from the "dead fleet" to be towed to the grain elevator, it was in charge of a licensed master. The vessel had no power and was without such equipment as blocks, booms, etc. The master was employed by the General Agent, American Foreign Steamship Corporation, and was on call for the handling of grain ships. The Maritime Commission paid the bill for services rendered. The master maintained log entries from the time the vessel left the "dead fleet" until its return, but this log was not kept aboard the ship. There were six linemen, not signatory to any articles, employed through a contractor retained by the General Agent, who boarded the S.S. Harry Lane while in the James River, and who accompanied the vessel to the grain elevator, remained aboard until she was secured to her berth, and then left the ship.

■ It is in this setting libellant urges that the S.S. Harry Lane was in "navigation" and that the shipowner's warranty of seaworthiness must be extended to a longshoreman lawfully aboard the vessel during unloading operations. The Court is unable to agree. While not directly in point, an analogy may be drawn to the absence of such warranty where the vessel has been withdrawn from navigation for long periods of time while

repairs are in progress. Raidy v. United States, D.C., 153 F.Supp. 777, affirmed 4 Cir., 252 F.2d 117; Berge v. National Bulk Carriers Corp., 2 Cir., 251 F.2d 717; Union Carbide Corp. v. Goett, 4 Cir., 256 F.2d 449.

In Desper v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 218, 96 L.Ed. 205, decedent was employed as an operator of one of a fleet of motorboats carrying sightseers on a river during the summer months only. Decedent assisted in laying the boats up for the winter and his employment was then terminated. The following March decedent was reemployed and, in April, was killed by an explosion while helping to paint, clean, and waterproof the boats preparatory to navigation. At the time, none of the boats was afloat, none had a captain or crew, and the work being performed was of the nature customarily done exclusively by shore-based personnel in the case of larger vessels. While the case does not discuss the warranty of seaworthiness as the action was instituted under the Jones Act, 46 U.S.C.A. § 688, the decision turned on whether decedent was a "seaman" at the time of his death. In holding that decedent was not a "seaman" within the purview of the Jones Act, the court said:

> "The distinct nature of the work is emphasized by the fact that there was no vessel engaged in navigation at the time of the decedent's death. All had been 'laid up for the winter'. Hawn v. American S.S. Co., 2 Cir., 107 F.2d 999, 1000; cf. Seneca Washed Gravel Corp. v. McManigal, 2 Cir., 65 F.2d 779, 780. In the words of the court in Antus v. Interocean S.S. Co., 6 Cir., 108 F.2d 185, 187, where it was held that one who had been a member of a ship's crew and was injured while preparing it for winter quarters could not maintain a Jones Act suit for his injuries: 'The fact that he had been, or expected in the future to be, a seaman does not render maritime work which was not maritime in its nature'."

Admittedly the Jones Act is inapplicable to this case as libellant was not an employee of respondent, but the theory behind Sieracki is that the longshoreman is performing the work formerly reserved to the seaman and hence is entitled to the warranty of seaworthiness. In Hawn v. American S.S. Co., 2 Cir., 107 F.2d 999, the vessel had been out of commission since November, 1937, when she brought a cargo of grain to Buffalo. In the spring of 1938, she was hauled by tugs to the outer harbor and anchored with only a shipkeeper aboard. Her classification was lost and could not be regained without a new inspection. During the summer months the vessel was not in use but, in October, the owners decided to use her for the storage of soya beans. A licensed master hired two tugs and caused the vessel to be shifted alongside a grain elevator, having employed six men to handle the lines. One of the men was injured during loading operations by catching his hand in a winch while warping the vessel back and forth along the wharf in order that the grain chutes could reach the ship's hatches. The accident occurred on November 15, 1938; loading operations were thereafter completed; but the vessel was not taken away from the wharf until January, 1939, at which time another vessel took her place. The vessel on which plaintiff was injured was thereafter brought back to the wharf in February. It is freely recognized that Hawn was decided prior to Sieracki and, for this reason, a portion of the court's reasoning may be disregarded. On the subject of "navigation" the syllogism is still applicable and Hawn is cited with approval by the United States Supreme Court in Desper v. Starved Rock Ferry Co., supra, a case decided after Sieracki. Referring to Hawn, it is said by the court:

> "As for navigation, it does not cease when the ship is in drydock for repairs, awaiting new business. Hunt v. United States, D.C., 17 F. Supp. 578, affirmed 2 Cir., 91 F.2d 1014. On the other hand she is

withdrawn from navigation, if laid up for the winter with a shipkeeper. Seneca W[ashed] G[ravel] Corp. v. McManigal, 2 Cir., 65 F.2d 779, Cf. Gonzales v. United States S. B. E. F. Corp., D.C., 3 F.2d 168. The case at bar is between these two; she was not to transport goods, but to store them in the stead of a grain elevator. True, she was to be moved in the sense that her position was to be changed; and if the decision of Judge Benedict in The Joshua Leviness, Fed.Cas.No.7,549, means that movement for profit of any kind whatever is necessarily 'navigation' for all purposes, this movement was such. However, Judge Benedict was deciding a case under the navigation laws, and while we see no reason to challenge the result, we do not feel bound to apply it as a general principle to all situations. We think with the judge in the case at bar that this ship was withdrawn from navigation." [107 F.2d 1000.]

Our attention is directed to the recent case of Butler v. Whiteman, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754, reversing and remanding Harris v. Whiteman, 5 Cir., 243 F.2d 563. The facts involved a "dead ship" (tug) made fast to a floating barge. Decedent was last seen alive while engaged in the engine room cleaning the boilers preparatory to a Coast Guard inspection. In a proceeding under the Jones Act the judgment, as approved by the Circuit Court of Appeals, was for the defendant on a directed verdict. The Supreme Court reversed and remanded the cause for trial holding, among other questions, that petitioner's evidence presented an evidentiary basis for a jury finding as to whether or not the tug was in navigation. The court, as to this point, cited Senko v. La Cross Dredging Corp., 352 U.S. 370, 373, 77 S.Ct. 415, 1 L.Ed.2d 404, and Carumbo v. Cape Cod S.S. Co., 1 Cir., 123 F.2d 991. The other grounds for the reversal are hardly pertinent.

Manifestly the Supreme Court has determined that a factual question arises in ascertaining whether a ship is in navigation. This court, having expressed the opinion that the S.S. Harry Lane was not in navigation, so finds as a matter of fact.

Analyzing the authorities cited by the Supreme Court in Butler v. Whiteman, supra, we find but little assistance from the Senko case. There the petitioner's duty was primarily to maintain the dredge during its anchorage and for its future trips. It was pointed out that petitioner would have a significant navigational function when the dredge was put in transit. The sole question presented was whether petitioner was a member of a crew at the time of his injury; a matter which the court said was for the jury. While the dredge was anchored to the shore at the time of the injury and during all the time petitioner worked for the dredge owner, and it is admitted that the dredge, like most dredges, was not frequently in transit, nevertheless the dredge was readily capable of transit and had not been removed from navigation as had the S.S. Harry Lane.

Carumbo v. Cape Cod S.S. Co., supra, also cited by the Supreme Court, is more in point. An excursion vessel ran between Boston and Provincetown during the summer season. At the beginning and end of each season it was customary for some of the men to work in the engine room, either preparatory to sailing or to laying up for the winter. When the vessel tied up at Boston at the end of the 1940 season, plaintiff, employed as an oiler during the summer season, requested his discharge but was told that he was being kept on in the event the ship was taken over by the Government. In fact, all the engine room personnel were retained. The accident occurred shortly after the close of the summer season. In holding that the injured man was a seaman and member of the crew, as well as determining that the vessel was in navigation, the court said as to this latter point:

"There remains to be defined the word 'navigation'. It has been

held that a ship is not in navigation if there is no present hope or intention of having her go to sea and if it would take a long time to put her in shape for an ocean voyage. Gonzales v. United States Shipping Board, supra. * * * A ship is in navigation, however, when it returns from a voyage and is taken to dry dock to undergo repairs preparatory to making another trip. Hunt v. United States, supra; Hawn v. American S.S. Co., supra. It is our opinion that a ship is in navigation, although docked, if it remains in readiness for another voyage. It need not be under contract." [123 F.2d 995.]

Applying these principles to the S.S. Harry Lane, it is clear that she was not in "navigation" in the legal and factual sense. It is argued that such a ruling would exonerate a vessel in this category from the responsibilities of any collision while being towed from the "dead fleet" to the dock. On the contrary, a ship may be considered in navigation for the purpose of applying navigation laws, but not in navigation for the purpose of determining the shipowner's liability for injury to persons claiming the rights of a seaman.

The recent decision in West v. United States, 3 Cir., 256 F.2d 671, 672, presents a situation substantially identical with the existing controversy. The vessel, after World War II, was put in "moth balls" at Norfolk. During the Korean conflict it was decided to reactivate her and she was towed from Norfolk to Chester, Pennsylvania, and from Chester brought up and tied alongside a pier in Philadelphia. Atlantic Port Contractors had full charge of the work of reactivation. Libellant, an engineer employed by Atlantic, was injured when a metal plug came out of an overhead water pipe when a co-employee turned on the water without warning. While the status of the libellant, West, is different from that of the libellant, Roper, a longshoreman, the principle involving the status of the vessels is essentially the same, where the Third Circuit said:

"We do not think that the 'Mary Austin' at the time of this accident was a ship in navigation * * *

"Counsel for the libelant insists that anything floating on the water is in navigation although he concedes that an uncompleted vessel just launched is not in navigation. See Frankel v. Bethlehem-Fairfield Shipyard, Inc., 4 Cir., 1942, 132 F.2d 634. But cf. United States v. Lindgren, 4 Cir., 1928, 28 F.2d 725."

After referring to Desper v. Starved Rock Ferry Co., supra, the opinion continues:

"We think the reason which controls here is that the vessel was out of service as a ship fully and as completely as a vessel which has just been launched but which is not yet ready for service as a ship. * * * It is not as though the 'Mary Austin' had finished a voyage and was having repair work done before resuming business again. This ship had been laid up for some time and had to be thoroughly rehabilitated before getting back to service. She had no crew, contrary to argument made by libelant. There were employees of the United States on the ship. They had signed no articles and they were there not as a ship's crew but as inspectors on behalf of the United States to see that the work was done in accordance with the contract."

Libellant, in his brief, relies upon Halecki v. United New York & New Jersey S. H. P. Ass'n, 2 Cir., 251 F.2d 708, 715, a case decided by the Second Circuit on the same day as Berge v. National Bulk Carriers Corp., supra. On February 24, 1959, the Supreme Court of the United States reversed Halecki sub nom. United New York & New Jersey S. H. Pilots Ass'n, v. Halecki, 357 U.S. 903, 78 S.Ct. 1149, 2 L.Ed.2d 1154. In short, Halecki as it now is interpreted by the highest court carries with it the clear implica-

tion that the libellant herein "was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed". The operation of a marine leg, while concededly a part of the discharging operation, requires the services of the expert stevedore trained in the use of such equipment. The doctrine of escape from liability for unseaworthiness by delegating to others work traditionally done by members of the crew has been substantially clarified in Halecki by limiting such liability to those who did the "type of work" traditionally done by seamen, and were thus related to the ship in the same way as seamen "who had been or were about to go on a voyage". When we consider the nature of the duties being performed by libellant, the type of equipment in use, the owner's lack of control over discharge operations, the vessel's removal from navigation, and the limited use of the ship for storage purposes, the conclusion is inescapable that the warranty of seaworthiness does not apply in such circumstances. It differs from a barge, dredge or floating crane which is in use or contemplated use at all times. Seaworthiness contemplates a vessel which will, in due time, be used for the purposes of navigation—not a ship which was once used for such purpose and is now adopted as a substitute for a warehouse which requires occasional towage to the mainland for servicing or sale of its cargo.

This Court is not unmindful of the fact that the storage and subsequent sale of grain constitutes a commercial endeavor but this fact, standing alone, does not place a vessel in navigation. Hawn v. American S.S. Co., supra, controls this phase of the case and has been cited with approval by the Supreme Court in Desper v. Starved Rock Ferry Co., supra. The mere use of a vessel for the storage of grain which, of necessity, requires that the ship be taken occasionally to the grain elevator for the purpose of discharging the grain, does not place in navigation that which has been removed from navigation.

Proctors for the United States will prepare an appropriate decree dismissing the libel with costs. This opinion is adopted by the Court in lieu of specific findings of fact and conclusions of law in accordance with General Admiralty Rule 46½, 28 U.S.C.A. Present decree after endorsement by proctor for libellant.