ROPER *v.* UNITED STATES ET AL.

No. 16.   Argued October 12, 16, 1961.—Decided November 6, 1961.

*Sidney H. Kelsey* argued the cause and filed briefs for petitioner.

*Leavenworth Colby* argued the cause for the United States.   With him on the briefs were *Solicitor General Cox, Assistant Attorney General Orrick, Morton Hollander* and *David L. Rose.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner, a longshoreman, brought this libel *in personam* against the United States pursuant to the Suits in Admiralty Act, § 2, 41 Stat. 525, 46 U. S. C. § 742.[1] Claiming injuries suffered while aboard a government ship removing grain to an elevator, petitioner sought recovery

---

[1] Other parties, not concerned with our disposition, were impleaded.

on the grounds of unseaworthiness and negligence. The District Court dismissed the libel after finding that there was no negligence, and that since the ship in fact was not in navigation there was no warranty of seaworthiness. 170 F. Supp. 763. This dismissal was affirmed by a divided Court of Appeals, 282 F. 2d 413, and a petition for certiorari requesting review of the seaworthiness issue was granted. 365 U. S. 802. We now affirm the judgment below.

The S. S. *Harry Lane* was a liberty ship of World War II origin, which was deactivated from service and "mothballed" in 1945. In this process her supplies, stores, nautical instruments, cargo gear and tackle were removed; her pipes and machinery were drained and prepared for storage; and her rudder, tail shaft and propeller were secured. As a result of such action the ship lost her Coast Guard safety certification as well as her license to operate, both of which were requisite to a vessel in navigation. Indeed, the trial court found that "admittedly" reactivation of the ship would have required a major overhaul.

In 1954 the Government was confronted with an urgent need of storage facilities for the country's surplus grain, and a decision was made to utilize as warehouse space the holds of some of the deactivated liberty ships. The ships were not reactivated for navigation nor used for transportation purposes, but were utilized solely as granaries for the storage of the Government's grain. Pursuant thereto, the use of the S. S. *Harry Lane* was covered by a general storage agreement between the Continental Grain Company and the Commodity Credit Corporation, and it was towed to loading facilities, filled with grain, and returned to the "dead fleet" of some 360 vessels, where it remained for two years.

In September 1956 a sale was made of the grain stored in this ship, and she was towed back to the grain elevator for the unloading operation. As in the earlier movement,

no repairs or structural changes preparatory to activating the ship were made; nor was there any attempt to obtain a safety certificate or a license to operate as a vessel in navigation, and none was issued. The movement was by tug, with a licensed riding master and six linemen stationed aboard the dead vessel. The linemen were discharged from the vessel after she was secured to her berth at the grain elevator, the riding master alone remaining to guard the vessel. The line handlers did not sign on as seamen for the vessel, and the tugboat captain was "in charge of the move from the Fleet down to the berth" with the riding master "subject to the orders of the tugboat captain."

The unloading operation was carried out by Continental Grain Company. The grain was removed by a "marine leg," a large shore-based mechanism containing a conveyor belt which lifts grain from the ship's hold into the adjacent grain elevator leased by Continental. The marine leg was owned and maintained by Continental, and their employee operated it from a control house in response to signals from longshoremen in the hold. When the grain level dropped to a certain depth, the balance was drawn onto the belt by "grain shovels"—plow-like devices attached by rope to winches in the leg. These shovels were operated by longshoremen employed by a stevedoring company, which had contracted with Continental to aid in the unloading. Petitioner, the foreman of the longshoreman crew, was injured when a latently defective part of the marine leg (a block through which one of the shovel ropes ran) broke and struck him. The entire unloading operation was directed and controlled by Continental and the stevedoring company, and the riding master was without power to supervise the work or inspect the equipment.

The test for determining whether a vessel is in navigation is the "status of the ship," *West* v. *United States,*

361 U. S. 118, 122 (1959). This is a question of fact, *Butler* v. *Whiteman,* 356 U. S. 271 (1958), and consequently reversible only upon a showing of clear error. Admittedly the S. S. *Harry Lane* was withdrawn from navigation in 1945. The issue presented is therefore whether events subsequent to 1945 altered this status. In 1954 the function of the ship was modified. However, she was not converted to a self-propelled, self-directed cargo vessel. Nor was she even prepared for use as a barge to transport cargo from one location to another. In point of fact it would be more accurate to note that the ship itself was not converted to any navigational use. While its hold was utilized as a granary or warehouse, the vessel *ipso facto* was not reactivated for service in navigation.

A second aspect of the ship's history since 1954 is the movement between the dead fleet and the grain elevator. This movement was by tug without assistance from the ship's motive or directional equipment which, indeed, was not in the least usable. The men aboard were not signed on as seamen, and the entire operation was directed and controlled by the tug captain. Unlike a barge, the S. S. *Harry Lane* was not moved in order to transport commodities from one location to another. It served as a mobile warehouse which was filled and then moved out of the way to perform its function of storing grain until needed, at which time it was returned and unloaded.

In light of the above circumstances, we cannot say as a matter of law that the S. S. *Harry Lane* had been converted into a vessel in navigation, and that the findings of the trial court were clearly erroneous.[2]

Since we are unwilling to upset the trial court's factual determination that the S. S. *Harry Lane* was not a vessel

---

[2] For cases involving similar facts and to the same effect see *Hawn* v. *American S. S. Co.,* 107 F. 2d 999 (C. A. 2d Cir. 1939); *Kissinger* v. *United States,* 176 F. Supp. 828 (D. C. E. D. N. Y. 1959); *Krolczyk*

in navigation, it follows that there was no warranty of the ship's seaworthiness. *West* v. *United States, supra; Kissinger* v. *United States,* 176 F. Supp. 828 (1959).[3] This limitation is analogous to that applied in libels under the Jones Act, where it has long been held that recovery is precluded if the ship involved is not a vessel in navigation. *Desper* v. *Starved Rock Ferry Co.,* 342 U. S. 187 (1952); *Hawn* v. *American S. S. Co.,* 107 F. 2d 999 (1939).

This disposition of the case makes it unnecessary for us to pass upon the remaining question, *i. e.,* whether a shore-based marine leg is within the warranty of seaworthiness in the circumstances here disclosed.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

For the reasons stated by Judge Sobeloff in the Court of Appeals, I believe this ship at the time of the accident was not a "dead ship" but "a vessel in navigation," because it was "being actually used as a barge, and transporting a cargo." 282 F. 2d 413, 419.

---

v. *Waterways Navigation Co.,* 151 F. Supp. 873 (D. C. E. D. Mich. 1957). *Lawlor* v. *Socony-Vacuum Oil Co.,* 275 F. 2d 599 (C. A. 2d Cir. 1960), is not *contra.* There minor repairs were underway on an active ship with a full crew aboard.

[3] The view that a vessel not in navigation extends no warranty has often been expressed in the more familiar context of to whom does the warranty extend. *E. g., Union Carbide Corp.* v. *Goett,* 256 F. 2d 449 (C. A. 4th Cir. 1958). Implicit within such cases is the reasoning that those working on vessels not in navigation are not seamen (or doing seamen's work) and consequently not among those employees protected by the warranty of seaworthiness.