Andrew SMERAGULIO, Libelant,

v.

UNITED STATES of America, Respondent.

UNITED STATES of America, Petitioner-Respondent,

v.

MARINE COMPOSITION PAINT AND SCALING COMPANY, Inc., and Evelyn C. Back, doing business under the trade name and style of Inland Marine Company, Respondents-Impleaded.

No. 20618.

United States District Court
E. D. New York.

Jan. 12, 1962.

Nathanson, Lindenbaum & Young, Brooklyn, N. Y., Standard, Weisberg, Harolds & Malament, New York City, Malcolm B. Rosow, New York City, of counsel, for libelant.

Joseph P. Hoey, U. S. Atty., Brooklyn, N. Y., Louis E. Greco, Walter L. Hopkins and Erwin W. Rossuck, Admiralty & Shipping Section, Dept. of Justice, New York City, of counsel, for respondent.

Charles G. Tierney, New York City, Raymond C. Green, New York City, of counsel, for respondent-impleaded, Marine Composition Paint & Scaling Co., Inc.

ABRUZZO, District Judge.

This proceeding was commenced by libelant to recover damages from the United States of America, respondent, sustained by reason of the alleged unseaworthiness of the vessel S.S. Francis A. Wardwell and the negligence of said respondent in failing to furnish libelant with a safe place to work. The respondent made an agreement in writing dated September 28, 1955 (Ex. A), with one Evelyn C. Back who transacted business under the firm name and style of Inland Marine Company, with a place of business within the jurisdiction of this Court. That agreement (Ex. A) included among its specifications the removal of all rust and scale from all surfaces in hold No. 5. Inland Marine Company was impleaded in this proceeding. It filed no answer and is in default.

The respondent also impleaded Marine Composition Paint and Scaling Company, Inc., hereinafter referred to as Marine Composition. Marine Composition was the subcontractor of Inland Marine Company. The subcontractor interposed an answer and contested the libelant's claim. Libelant was in the employ of the subcontractor and had been engaged to work aboard the vessel as a scaler-painter.

The issue of liability was the only issue tried by the Court. The trial of the question of damages was reserved, awaiting the Court's decision on the question of liability.

The S.S. Francis A. Wardwell was a deactivated liberty ship utilized as a granary whose certificate of inspection was forwarded to the United States Coast Guard for surrender on June 2, 1953 (Ex. G), and accepted by the Coast Guard June 4, 1953 (Ex. F). This certificate was requisite for a vessel in navigation.

On September 27, 1955, the S.S. Francis A. Wardwell was towed from her mooring at Jones Point in the Hudson River, New York, to Pier 41, Brooklyn, New York, for the purpose of discharging grain and to receive a new load of grain prior to her return to the laid-up fleet. She was moored at Pier 41, her cargo was discharged, and the vessel was fumigated. On October 10, 1955, Marine Composition commenced cleaning and scraping the holds of the vessel and also bailing water from hold No. 5 (Log Book, Ex. AA).

Libelant who had never done this type of work before testified that he had been hired on Pier 41 on October 11, 1955, as a scraper-cleaner and his job was to scrape rust from the sides of the vessel. On the morning of October 11, he worked in hatch No. 4. After lunch he returned to that hatch and, after working there about 10 minutes, was told to report to hatch No. 5. In No. 5 he was directed by a foreman to pick up a scraper and scrape the bulkhead. This order was given in the presence of an employee of the vessel whom libelant described as a man wearing a khaki uniform and a peaked cap. The deck of this hatch was covered with mud and water about three-fourths of an inch deep, and he had to step through this in order to get to the hold. There was a ladder furnished for his use to get into the hatch but there were no other ladders in this hatch which he could use to do his work and, therefore, at the time of the accident he was standing upon the ribs. The ribs were 3 feet apart on which were cleats 1 foot apart. After working for about 20 minutes and while standing on a rib about 5 feet above the deck, holding on to a cleat with his left hand and using a 3-foot scraper with his right hand, he lunged at a piece of rust and slipped and fell to the deck, landing on his back, and was injured. He attributed his fall to the slippery condition of his shoes. He was assisted up by his fellow-workers and after resting for awhile he continued working the rest of the afternoon on the deck of the ship. He was then taken to the Emergency Room of Methodist Hospital where he was X-rayed and bandaged or strapped. The following February he was hospitalized at the Maimonides Hospital.

Libelant's testimony as to the condition of the hold was corroborated by the witness Carrique, a fellow-employee. Car-

rique testified that he had worked aboard the vessel the day before and asked libelant to apply for work. He worked with libelant in hatch No. 5 and also stood on cleats or pegs which he described as hooks. He could not recall whether there were any ladders in hatch No. 5. He testified that he saw plaintiff fall and he also testified that he saw men in uniform who were wearing caps similar to the type worn by naval officers or seafaring men. Carrique claimed that all the hooks were dirty.

The witness Anderson qualified as an expert and testified. He was an employee of T. J. Stevenson Company as port engineer and had held a chief engineer's license for approximately 40 years. He was sent to meet the S.S. Francis A. Wardwell at the dock and was there when she arrived. He went aboard the vessel with the vessel's captain, Captain Erskine. He visited the engine room and found that the engines had been drained out and covered with consol oil, a preservative, and could not have been operated. The boilers also contained oil and could not have been operated. The cylinder heads of the generating machinery had been opened and the cylinders had been drained and greased and could not have been operated. The vessel's deck machinery could not operate because it had been drained and blown, and the cylinder heads opened and small wooden wedges inserted. The log book of the vessel (Ex. AA) discloses that it had rained all day on October 7, 1955, partially on October 8, and all day on October 9. On October 10th, the day before the accident, water had leaked into the No. 5 hatch through the "high hat." It did not rain on October 11th, the day of the accident. The tarpaulin covering the hatch had blown, allowing water to go into the hatch. The log book also discloses that during her stay at Pier 41 the vessel had a captain and gangway watchman aboard during the hours of 8 a. m. to 4 p. m., from 4 p. m. to midnight a mate and a gangway watchman, and two other men from midnight to 8 a. m.

The contract (Ex. A) contained many general provisions and specifications. Paragraph 2 reads as follows:

"Unless otherwise specifically directed, the Contractor shall furnish the necessary labor, material and/or equipment to accomplish items of work in the accompanying specification."

Paragraph 4 reads as follows:

"Contractor while carrying out the foregoing requirements must take care and ample precaution to prevent seepage of moisture from weather elements or any other cause to enter holds; in the event of rain, contractor must cover weather deck hatches accordingly."

Portions of the deposition of William P. Lewis taken by the libelant on November 17, 1961, were read into evidence. He had an unlimited master's license for 11 years, had been a stevedore superintendent, a cargo supervisor, and sailed as a chief mate. He had been master aboard two liberty ships which had been part of the storage fleet in the James River laid-up reserve fleet that had been moved to a grain pier in Norfolk, Virginia, by tugs because these vessels were, as he said, "dead" and could not be steered. They were not grain ships. He had served aboard them for a total of 18 days. He had also been employed in the Port of New York as a stevedore superintendent and served in other capacities. He testified as to what in his opinion were the duties of the master aboard a grain-carrying vessel coming from a storage fleet. He did not have very much experience in working on a deactivated ship. His testimony mainly was to the effect as to what he did on a ship and not what the custom and practice was. In a hypothetical question he was asked the duties of a captain aboard a vessel while an independent contractor was scraping rust off the vessel and cleaning it. The answer was disallowed because the Court felt that he had not had sufficient experience to testify as to the custom and practice in and

around the Port of New York and because he had not had sufficient experience with that type of work to qualify as an expert, and also because the question did not call for an answer pertaining to custom, practice and usage. He was questioned about the custom and practice of ships' cleanings in the Port of New York—of "any kind of ship"—but this was disallowed because the question did not relate to the cleaning of a deactivated vessel.

The Court said in Shipley v. Pittsburgh & L. E. R. Co., 83 F.Supp. 722 (W. D.Pa.), as follows (p. 750):

"The existence of a usage or custom can only be proved by numerous instances of actual practice and not by the opinion of a witness. Aurand v. Universal Carloading and Distributing Co., 131 Pa.Super. 502, 200 A. 285; Wilson Distilling Co. v. Foust Distilling Co., D.C., 60 F.Supp. 373."

In Julius Kayser & Co. v. Textron, Inc., 228 F.2d 783 (C.A. 4th), the Court stated (pp. 790–791):

"In reaching our conclusions we have not relied upon evidence purporting to establish a 'custom' that the undefined term 'occupancy' in leases of textile plants meant occupancy for manufacturing operations, and not entry merely to prepare the property for such use. The evidence offered by Textron, relating to Textron's own experience, was not shown either to have been general in character, in New England or South Carolina, or of such uniformity and duration as to charge Kayser with knowledge. * * *"

Unseaworthiness

■ The facts in this case are controlled by West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161, followed by Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1, decided by the Supreme Court of the United States on November 6, 1961.

The West case involved the liability of a shipowner for injuries suffered by an employee of an independent contractor while working inside the main engine of a vessel as it was undergoing a complete overhaul at the contractor's repair docks in Philadelphia. There was a claim of unseaworthiness and negligence in not furnishing the libelant with a safe place to work. The specifications of the contract to overhaul and reactivate the Mary Austin are much like the contract at issue here (Ex. A). The libelant invoked the doctrine of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and subsequent cases, holding that the warranty of seaworthiness applies to shore-based workers while on board ship and performing work traditionally done by seamen. The Court found that the Mary Austin was withdrawn from any operation whatever while in storage with the "moth-ball fleet." The water had been drained from her water system and an antirust preservative was injected therein. Her subsequent towing to Philadelphia was for the specific purpose of delivery to Atlantic Port Contractors, Inc., a contractor, to render her seaworthy.

It was held that the Mary Austin was not in maritime service. The libelant took his orders from the contractor, not the shipowner. The undertaking was not "ship's work" and it would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case. It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done and, therefore, the Seas Shipping Co. v. Sieracki, supra, line of cases was not applicable and there could be no express or implied warranty of seaworthiness.

In Roper v. United States, the libelant was employed by a stevedoring company. He sought recovery for injuries sustained while aboard a government ship removing grain to an elevator. The United States Government owned the ship. Libelant's action was based upon unseaworthiness and negligence. The Harry Lane was a liberty ship deactivated from service and

"moth-balled" in 1945. In this process her supplies, stores, nautical instruments, cargo gear and tackle were removed; her pipes and machinery were drained and prepared for storage; and her rudder, tail shaft and propeller were secured. As a result of such action the ship lost her Coast Guard safety certification as well as her license to operate, both of which were requisite to a vessel in navigation. No repairs or structural changes preparatory to activating the ship were made; nor was there any attempt to obtain a safety certificate or a license to operate as a vessel in navigation, and none was issued. The movement was by tug as in the case at bar. The entire unloading operation was directed and controlled by Continental Grain Company and the stevedoring company. The riding master was without power to supervise the work or inspect the equipment. The United States Supreme Court was unwilling to upset the trial court's factual determination that the vessel was not a vessel in navigation, and it found that there was no warranty of the ship's seaworthiness.

The cases cited by libelant are not in point for they involved ships in operation with a full crew aboard.

### Negligence

In his brief, the libelant makes a claim of negligence on the part of the officers of the ship in failing to repair a defective tarpaulin until the hold was full of water. A further claim is made that this libelant was permitted to work under these conditions in hatch No. 5; that the deck of hatch No. 5 was rendered slippery, and that climbing on the cleats from such a deck constituted a dangerous and hazardous condition and, further, that it failed to order the contractor to furnish ladders to his employees.

At the outset, it must be noted that the libelant had never worked on a ship before and that this was his first day.

The agreement in evidence (Ex. A) included the general provisions and specifications for the contractor. Paragraph 2 provided that the contractor should furnish the necessary labor, material and/or equipment to accomplish items of work in the accompanying specification. This would include ladders. Paragraph 4 of the agreement cast upon the contractor the care and precaution to prevent seepage of moisture from weather elements or any other cause to enter holds. This would include the condition which libelant claims caused the slippery deck. The contractor, therefore, knew the duty and obligation cast upon him and this in turn cast a duty upon him to his own employees, in particular, this libelant.

It was the duty of the impleaded-respondent, Marine Composition, to completely clean hatch No. 5. It does not appear in any part of the evidence that any of the crew had authority to direct the manner in which the work was to be performed, nor does it appear they attempted at any time to exercise such authority.

The Smooth Log of the ship (Ex. AA) shows that on October 9th, 10th and 11th, whatever employees of the ship were there made routine inspections, checked the lines, checked the gangway, padlocked storerooms, inspected decks, hatches, moorings, etc. It does not appear in any part of the log, nor does it appear in any of the evidence that the crew had the slightest control of either the work to be done or the men working for Marine Composition.

The log also contains an entry on October 10, 1955, that the men (contractor's) resumed work in hatches Nos. 1, 2, 4 and 5. Their work in hatch No. 5 constituted bailing out water from the hatch.

The accident to libelant occurred at a time when he was doing the work the contractor had been hired to perform.

The doctrine of negligence was aptly pointed out in the West case, supra (361 U.S. pp. 122–123, 80 S.Ct. p. 192):

"In presenting his alternative ground of recovery, the petitioner has a dual theory. He first says that the duty to furnish a safe place to work is a nondelegable duty, the

violation of which does not depend on fault. If unsuccessful in this position, he insists that respondent's failure to keep the water plug tight was negligence.

"Other than the doctrine of seaworthiness, whose nonrelevancy to this case we have set forth, our decisions establish no basis of liability apart from fault. Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. But we do not believe that such a duty was owed under the circumstances of this case. Petitioner overlooks that here the respondent had no control over the vessel, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both aspects of plaintiff's dual theory. There was no hidden defect in the water system. It was one of the objects to be repaired and its plugs were to be replaced where necessary. Its testing was to be done by the contractor—not by the shipowner. *It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe.* The respondent, having hired Atlantic to perform the overhaul and reconditioning of the vessel—including the testing—was under no duty to protect petitioner from risks that were inherent in the carrying out of the contract. The Courts of Appeals seem to have followed this rule. See Filipek v. Moore-McCormack Lines, [2 Cir.], 258 F.2d 734. Although some of respondent's employees were on board the ship here, this would not attach liability since they gave no orders, and did not participate in the work or supervise its progress, but were simply inspectors or observers. Id., at 737.

"Petitioner cites Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423 [79 S.Ct. 445, 3 L.Ed.2d 413] (1959), as the chief support for his contention. There the vessel was being unloaded of cargo and its employees had set the safety cutoff device on its winch at twice the tonnage limit of the rigging. When the stevedore, unaware of this situation, brought the winch into play, the rigging snapped and the injury resulted. We found that the safety cutoff had been adjusted by employees of the vessel in a way that made it unsafe and dangerous, and therefore the vessel was liable. But that situation is not comparable. There the vessel was in control of the owner, and he was liable under the absolute warranty of seaworthiness, as well as for the negligence of the ship's employees in setting the ship's safety cutoff device. * * *" (Italics added.)

The Court finds that the S.S. Francis A. Wardwell was not a vessel in navigation and, therefore, there was no warranty of seaworthiness. The Court finds further that there was no negligence on the part of the respondent, United States of America. It would be unfair to apply the doctrine of the requirement of a safe place to work on the part of a shipowner when he had no control over the ship or repairs.

This Court, therefore, concludes that respondent, United States of America, is accordingly entitled to a decree.

In view of this opinion, the question of contribution by Marine Composition Paint & Scaling Company, Inc., to the respondent becomes moot.

Findings of fact, conclusions of law and a decree in accordance with this decision must be presented within the next 15 days.