**William C. DEAN, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22817.**

United States Court of Appeals Ninth Circuit.

Nov. 28, 1969.

Rehearing Denied Jan. 1, 1970.

according to the District Court's determination, was under the exclusive control of Todd at all times relevant to the controversy.

In suing the Government, Dean alleged that the ship was unseaworthy and that the Government was negligent. As to the latter contention, the District Court found, in effect, that there was no negligence on the Government's part which contributed as a proximate cause of the accidents and Dean's resulting injuries. The finding is not clearly erroneous. There is abundant evidence to support it.

On the issue of unseaworthiness, the District Court's judgment in favor of the Government was based on the conclusion, among others, that "During the period of the work * * * the USS Toluga was not a ship in navigation, but was, instead, a dead ship. In the case of a dead ship, no duty of furnishing a seaworthy ship is imposed on the ship owner." We agree with this conclusion. The magnitude of the work, in cost, has been previously mentioned. The scope of the work, as well as ample support for the challenged conclusion, is further revealed by certain additional findings of the District Court, as follows:

Milan Moacanin (argued), Hollywood, Cal., for appellant.

Fred B. Belanger (argued), of Schell & Delamer, Los Angeles, Cal., Wm. Matthew Byrne, Jr., U. S. Atty., Clarke A. Knicely, Asst. U. S. Atty., Thomas E. Lohrey, Jr., Atty., Admiralty & Shipping Section, of counsel. Henry F. Walker, Los Angeles, Cal., John F. Meadows, Admiralty & Shipping Section, San Francisco, Cal., for appellee.

Before JERTBERG, BROWNING, and ELY, Circuit Judges.

PER CURIAM:

Dean, plaintiff below and appellant here, was injured while aboard the USS Toluga, a Naval vessel owned by the United States. The injuries resulted from Dean's having slipped on two successive days, first on a pipe and the second time on a ladder, while working as an employee of Todd Shipyards, Inc. (Todd). Although the ship was afloat in navigable waters, it was tied to Todd's dock, undergoing extensive overhaul and reconstruction. Todd was performing the work under a contract which called for Government expenditure in the approximate sum of $2,900,000.

The accidents occurred in the vessel's Number 2 pump room, an area which,

"21. The work required and resulted in the ripping out and removing from the ship the following: (1) All or substantially all of the ship's propulsion equipment, including all of the turbines, all main engines, all boilers and all or substantially all generators; (2) the entire steering system; (3) the main condensate pumps; (4) the bilge pumps; (5) all electronic gear and communications equipment including all radar. The work in pump room #2 involved ripping out of all the important machinery therein including the foundations for the machinery.

"22. The ship left drydock on December 30, 1965, when it was refloated and was towed and tied up to a dock of the general contractor where it remained until the work was completed. In late March of 1966 when the two ac-

cidents happened, all of the above-mentioned machinery and equipment was still off the ship.

"23. During the work and on the dates of the accidents, the ship had no power of its own. All power and other services including steam, water, communications, etc., were furnished to the ship from the shore. The ship was unable to move on its own power or even to steer itself if towed. It was essentially a hulk.

"24. During the entire course of the work the ship remained a commissioned Navy ship with its crew, including the crew's commanding officer, aboard. The crew was housed and fed aboard and conducted musters and courtmartials aboard. The crew itself also performed certain maintenance and repair work during the period, which work was not called for in the contract with Todd Shipyards and which work did not overlap or interfere with the work of Todd under the contract.

"25. Although the ship's crew retained some control of some limited areas of the ship, such as its living quarters, galley, and ward room, it had no control over the other areas of the ship which were within the exclusive control of the contractor. Among the areas within the contractor's exclusive control was pump room #2. That room was in the exclusive control of the contractor throughout the work period including before, on, and after March 28 and 29, 1966."

In the light of the foregoing findings and the evidence which supports them, no reasonable person could have believed, at the times in question, that the Toluga was a ship "in navigation" so that the Government was then holding its vessel, or pump room No. 2 thereof, out to Dean or anyone else as "seaworthy." *See* West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). *See also* Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961), wherein the Supreme Court held:

"The test for determining whether a vessel is in navigation is the 'status of the ship.' This is a question of fact, and consequently reversible only upon a showing of clear error. * * *

\* \* \* \* \* \*

"Since we are unwilling to upset the trial court's factual determination that the *S.S. Harry Lane* was not a vessel in navigation, it follows that there was no warranty of the ship's seaworthiness".

368 U.S. at 22, 24, 82 S.Ct. at 7 (citations omitted). *Compare* Berryhill v. Pacific Far East Line, 238 F.2d 385, 387 (9th Cir.), cert. denied, 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957).

Affirmed.