367 So.2d 241 (1979)
Chester G. BROWN, Jr., Appellant,
v.
STANWICK INTERNATIONAL, INC., and the Stanwick Corporation, Appellees.
No. 77-1126.
District Court of Appeal of Florida, Third District.
January 23, 1979.
Rehearing Denied February 26, 1979.
High, Stack, Lazenby & Bender and Alan R. Dakan, Miami, for appellant.
Gilbride & Heller, Miami, for appellees.
Before HENDRY, BARKDULL and SCHWARTZ, JJ.
*242 SCHWARTZ, Judge.
Chester Brown was injured when a motorcycle he was riding swerved to avoid colliding with a truck. One should not think, however, that this so-far commonplace situation gives rise only to routine issues of law. For one thing, the accident occurred in Iran; for another, this case involves a suit by Brown against his employer under the maritime law. We hold that Brown is entitled to a jury trial on his claim for maintenance and cure, but is precluded from recovery upon his claims for Jones Act negligence, unseaworthiness and breach of his contract of employment by a conclusive showing of a lack of legal relationship between his employer's alleged wrongdoing and his injuries. Therefore, we affirm in part and reverse in part the summary judgment entered for his employer on all issues below.
In January, 1972, Brown, entered into a written employment contract with Stanwick International, Inc., under which he was to be employed:
"... by Stanwick International Inc. aboard the Imperial Iranian ship Chah Bahar, a repair ship based at Bandar Abbas, Iran, for the purpose of performing operational watchstanding duties on IIS Chah Bahar for a period of one year commencing January 22, 1972, and ending January 21, 1973.
It is agreed that the above individual shall perform operational watchstanding duties, training of Iranian personnel, and such other assignments as may be made by Stanwick International Inc... ."
The agreement also stated that Stanwick was to provide Brown with "living accommodations aboard the repair ship ..."
The Chah Bahar was a former U.S. Navy vessel which had been leased to the Iranian Navy on October 1, 1971. After that date, it had ridden in navigable waters at a dock at the naval base in Bandar Abbas. Although the navigational room was in full working order, its boiler room was inoperative so that it could not get under way on its own power and was capable only of being towed from place to place. While moored to the dock, it secured its power by a connection, the permanence of which was in dispute, with a shore-based electrical power source. It was, Brown said, "tied up just like any conventional ship would be." When Brown first arrived in Iran soon after his employment, he began repair work on the ship's boilers so as to attempt to make them and the vessel fully operational.[1] Subsequently, he began the duties for which he was hired, that is, to aid in the functioning of the "repair ship." The vessel was actually extensively used to repair other Iranian ships which came alongside, and acted as a means of training Iranian naval personnel in that pursuit. Despite the representation in the contract, it was immediately apparent that living accommodations were not available aboard the vessel; the presence of "vermin" rendered them uninhabitable. For a short time Brown and other Stanwick employees were billeted in officers' quarters at the base; later they were moved to a "team house" located about ten kilometers away. Brown lived there and commuted to his duties on board the ship until June 27, 1972. On that day, while working on the ship, he was instructed by his foreman to return to the team house to repair the boiler there. On his way, the accident occurred and Brown was seriously injured.
Claiming that he was a "seaman" engaged in the service of the vessel when the accident occurred, Brown sued Stanwick in the Dade County Circuit Court in a fourcount complaint. One count sought to recover "maintenance and cure." The three others prayed for personal injury damages on allegations of Jones Act[2] negligence, unseaworthiness and breach of the employment agreement respectively. All three of these theories were in turn based upon the failure of the defendant to maintain habitable or "seaworthy" living quarters aboard ship as agreed in the contract. The trial judge granted the defendant a summary *243 judgment as to all issues and Brown took this appeal.
The primary basis for the summary judgment seems to have been the conclusion that, as a matter of law, Brown was not a "seaman" at the time of the accident, thus establishing his inability to maintain an action for maintenance and cure, for negligence under the Jones Act, and for unseaworthiness. See Potashnick-Badgett Dredging Inc. v. Whitfield, 269 So.2d 36 (Fla. 4th DCA 1972), cert. denied, 272 So.2d 820 (Fla. 1973). We hold to the contrary that, at the least, a jury question was presented as to the plaintiff's legal status when the accident occurred.
In Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir.1959), the Fifth Circuit stated an often-cited and still viable formulation of the standards by which one's status as a "seaman" is to be determined:
"... (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips." (emphasis supplied)
In this case, it is clear that Brown had a "more or less permanent connection with the vessel," see Wilkes v. Mississippi River Sand & Gravel Co., 202 F.2d 383 (6th Cir.1953), cert. denied, 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344 (1953), and that the duties which he contracted to and did in fact undertake directly "contributed to the function of the vessel [and] to the accomplishment of its mission ..." and were those traditionally performed by seamen. Potashnick-Badgett Dredging Inc. v. Whitfield, supra, at 269 So.2d 41. The real bone of contention therefore is whether the Chah Bahar itself was, as is also required, a "vessel ... in navigation." Warner v. Fish Meal Co., 548 F.2d 1193 (5th Cir.1977); Salgado v. M.J. Rudolph Corp., 514 F.2d 750, 754 (2d Cir.1975). We think this issue is properly for the jury.
There are, of course, numerous cases which have held the Jones Act and the unseaworthiness doctrine applicable to "special purpose structures" which are designed to float on water but which have no motive power of their own and do not perform the conventional functions of a vessel in carrying goods or passengers from place to place. E.g., Gianfala v. Texas Co., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955) (submersible drilling barge); Senko v. LaCrosse Dredging Corp., 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957) (dredge); Butler v. Whiteman, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958) (inoperable tug lashed to barge moored to wharf); Salgado v. M.J. Rudolph Corp., supra (floating crane); Offshore Co. v. Robison, supra (mobile drilling platform); Marine Drilling Co. v. Autin, 363 F.2d 579 (5th Cir.1966) (submersible drilling barge). These cases establish that the requirement that a vessel be "in navigation" means only that it be actively performing a water-based marine function at the pertinent time. Potashnick-Badgett Dredging Inc. v. Whitfield, supra, at 269 So.2d 41, McKie v. Diamond Marine Co., 204 F.2d 132 (5th Cir.1953). We think a jury could find that the Chah Bahar which, while riding in navigable waters, was actively functioning as a repair ship and naval training facility met this test.
In arguing otherwise, the appellee relies on several decisions in which formerly active vessels have been deemed no longer "in navigation." All of these cases, however, are decisively distinguishable from this one. In each of them, the ship in question, unlike the Chah Bahar, had been totally removed from its water-based function, because it had been "mothballed," West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); converted to a grain storage facility, Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); or pulled out of service into drydock for a lengthy period *244 and for extensive repairs, Hodges v. S.S. Tillie Lykes, 512 F.2d 1279 (5th Cir.1975); Johnson v. Oil Transport Co., 440 F.2d 109 (5th Cir.1971), cert. denied, 404 U.S. 868, 92 S.Ct. 109, 30 L.Ed.2d 111 (1971). Moreover, since a "vessel in navigation" need have no power of its own to begin with, Gahagan Construction Corp. v. Armao, 165 F.2d 301 (1st Cir.1948), cert. denied, 333 U.S. 876, 68 S.Ct. 905, 92 L.Ed. 1152 (1949), it can hardly be decisive that the Chah Bahar's formerly operable boilers were no longer so. Finally, while the vessel was attached to a power source on the shore, this fact could not serve, as a matter of law, to turn it magically from what looked and acted simply like a ship moored to a wharf into a floating drydock or its equivalent. See Atkins v. Greenville Shipbuilding Corp., 411 F.2d 279 (5th Cir.1969), cert. denied, 396 U.S. 486, 90 S.Ct. 105, 24 L.Ed.2d 96 (1970). Only a jury could say whether that transmogrification had taken place.
Brown was injured in the course of his employment and "in the service of the ship" while on his way at his employer's instructions to make repairs at the crew's living quarters. See Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1942); Central Gulf Steamship Corp. v. Sambula, 405 F.2d 291 (5th Cir.1968). Should the jury determine that he was in fact a "seaman" when the accident occurred, he would therefore be entitled to the recovery of "maintenance and cure" (his medical expenses and a daily stipend until maximum medical improvement, Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949)) from his employer, Stanwick International. Spinks v. Chevron Oil Co., 507 F.2d 216, 226 (5th Cir.1975), and cases cited. The summary judgment as to this count therefore cannot be sustained.
We reach a different conclusion as to the other counts. Although we have held that Brown has the right to maintain an action against his employer under the Jones Act and for unseaworthiness, it is clear beyond question that he cannot recover on those claims. Unlike maintenance and cure, which is the general maritime law's equivalent of workmen's compensation, recovery under the Jones Act requires a showing of employer negligence; recovery for unseaworthiness, requires a demonstration of a breach of the warranty of vessel's seaworthiness; both require a legally adequate causal link between the negligence or unseaworthy condition and the accident and injuries involved. Spinks v. Chevron Oil Co., supra, at 507 F.2d 222-223. It is the latter element which is totally lacking here.
Even assuming Brown could establish, as alleged, that the defendant negligently failed properly to maintain the ship's living facilities and that their uninhabitability rendered the vessel unseaworthy, the only relationship between that condition and the accident is the suggestion that if proper living quarters had been available on board, Brown would not have had to go to the team house to fix the boiler and therefore would not have been at the place where the accident occurred. While it may be that "but for" the condition of the vessel, Brown would not have been injured, this connection is simply not sufficient to permit fixing responsibility for the accident upon the conduct of the defendant. See text and cases cited in W. Prosser, Law Of Torts § 41 (4th ed. 1971), at nn. 5-6. Prosser admonishes us that we should not deal with issues such as this in terms of causation but rather simply determine whether a particular cause is
"... so closely connected with the result and of such significance that the law is justified in imposing liability . ." Prosser supra, p. 237.
This is essentially the test stated in the Restatement of Torts, 2d and applied to maritime tort law by the Fifth Circuit in Spinks v. Chevron Oil Co., supra, at 507 F.2d 223:
"... The elements of legal cause are negligence, and causal connection between the negligence and the injury, the invasion of a legally protected interest, and lack of a countervailing legally protected interest as a defense to liability. Restatement 2d Torts § 9. The defendant's *245 negligence must be a substantial factor in bringing about the harm, with no rule of law relieving the actor of fault. Id. § 431. `Substantial' means more than `but for' the negligence, the harm would not have resulted, (id. Com. a) and more than merely negligible negligence. Id. Com. b. The gist of it is that some responsibility for the effect must accompany the cause." (emphasis supplied)
Even though the causal connection required under the Jones Act and for unseaworthiness does indeed approach the vanishing point, see Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957); McCalley v. Seaboard Coast Line R. Co., 265 So.2d 11 (Fla. 1972), it has not yet reached it. See Davis v. Burlington Northern, Inc., 541 F.2d 182, 185 (8th Cir.1976), cert. denied, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976); Gwinett v. Albatross S.S. Co., Inc., 243 F.2d 8 (2d Cir.1957), cert. denied, 355 U.S. 828, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957). And whether we apply the Prosser-Restatement "legal cause" test or any of the more traditional ones, we have no difficulty in holding that Stanwick cannot be held liable for Brown's accident. The Second Circuit's statement in Petition of Kinsman Transit Co., 388 F.2d 821, 824-825 (2d Cir.1968), is both apt and applicable:
"On the previous appeal we stated aptly: `somewhere a point will be reached when courts will agree that the link has become too tenuous  that what is claimed to be consequence is only fortuity.' 338 F.2d at 725. We believe that this point has been reached with the Cargill and Cargo Carriers claims. Neither the Gillies nor the Farr suffered any direct or immediate damage for which recovery is sought. The instant claims occurred only because the downed bridge made it impossible to move traffic along the river. Under all the circumstances of this case, we hold that the connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery. `The law does not spread its protection so far.' Holmes, J., in Robins Dry Dock, supra, 275 U.S. 303 at 309, 48 S.Ct. [134] at 135, [72 L.Ed. 290.]
In the final analysis, the circumlocution whether posed in terms of `foreseeability,'[3] `duty,'[4] `proximiate [sic] cause,' `remoteness,' etc. seems unavoidable. As we have previously noted, 338 F.2d at 725, we return to Judge Andrews' frequently quoted statement in Palsgraf v. Long Island R.R., 248 N.Y. 339, 354-355, 162 N.E. 99, 104, 59 A.L.R. 1253 (1928) (dissenting [sic] opinion): `It is all a question of expediency * * * of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."
For generally the same reasons, but based upon a perhaps more traditional analysis, Brown's damage claim for breach of his employer's contractual obligation to provide living quarters aboard ship is also barred. It is apparent, under the familiar rule of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145 (1854), which is applicable in Florida, e.g., Tampa Union Terminal Co. v. Richards, 108 Fla. 516, 146 So. 591 (1933); Brock v. Gale, 14 Fla. 523 (1874); Evenson v. Miami Medical Center, Inc., 128 So.2d 626 (Fla.3d DCA 1961), that the damages Brown sustained in the accident were not
"... such damages as would naturally result from the breach of the contract, whether as the ordinary consequence of such a breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it ..."
Poinsettia Dairy Products, Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306, 310 (1936).
*246 The summary judgment as to the plaintiff's claim for maintenance and cure is reversed and the cause is remanded for a jury trial on that issue alone; the judgment below is otherwise affirmed.
Affirmed in part, reversed in part and remanded.
NOTES
[1] That task was never accomplished.
[2] 46 U.S.C. § 688.
[3] Davis v. Burlington Northern, Inc., supra; Gwinett v. Albatross S.S. Co., Inc., supra.
[4] Dangovich v. Isthmian Lines, Inc., 327 F.2d 355 (2d Cir.1964); D'Costa v. United States Lines Co., 227 F. Supp. 180 (S.D.N.Y. 1964).